No. 22-35555

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

FRIENDS OF THE CRAZY MOUNTAINS, a public land organization, et al.,
*Plaintiffs/Appellants*,

v.

MARY ERICKSON, in her official capacity as Forest Supervisor for the Custer
Gallatin National Forest, et al.,
*Defendants/Appellees*.

Appeal from the United States District Court for Montana
No. 1:19-cv-00066 (Hon. Susan P. Watters)

**FEDERAL APPELLEES' ANSWERING BRIEF**

TODD KIM
*Assistant Attorney General*

Of Counsel:

RACHEL HERON
ROBERT P. STOCKMAN
*Attorneys*

BABAK RASTGOUFARD
*Attorney*
Office of the General Counsel
U.S. Department of Agriculture

Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 353-3527
Robert.Stockman@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ...................................................................................... viii

INTRODUCTION ...............................................................................1

STATEMENT OF JURISDICTION ....................................................2

STATEMENT OF THE ISSUES ..........................................................2

PERTINENT STATUTES AND REGULATIONS ................................3

STATEMENT OF THE CASE .............................................................3

    A.    NEPA ...................................................................................3

    B.    Factual background ............................................................4

        1.    The contested trails ................................................5

        2.    The 2006 EIS and Travel Plan ..................................8

        3.    The 2009 EA and FONSI .......................................10

        4.    Implementing the Porcupine-Ibex reroute ...............13

    C.    Proceedings below ............................................................16

SUMMARY OF ARGUMENT ............................................................18

STANDARD OF REVIEW .................................................................21

ARGUMENT .....................................................................................22

I.    The Service complied with NEPA ................................................22

    A.    The Service analyzed the Porcupine-Ibex reroute in the
        2009 EA .............................................................................22

B.  The Service reasonably analyzed the Porcupine-Ibex reroute and found that it would not have a significant impact on the environment. ................................................ 31

  1.  The Service considered potential impacts to big game species and wildlife. ....................................... 37

  2.  The Service considered fisheries and aquatic resources. .................................................................. 40

  3.  NEPA does not require consideration of all impacts to recreation, and in any event, the Service adequately considered them. .................................... 43

  4.  The railroad deeds are irrelevant. ............................. 50

C.  The Service analyzed a reasonable range of alternatives. ................... 55

CONCLUSION ....................................................................... 59

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Alaska Env't Ctr. v. U.S. Dep't of the Interior*,
  983 F.3d 1077 (9th Cir. 2020) ................................................................27

*Alaska Survival v. Surface Transp. Bd.*,
  705 F.3d 1073 (9th Cir. 2013) ................................................................56

*Ashley Creek Phosphate Co. v. Norton*,
  420 F.3d 934 (9th Cir. 2005) ..................................................................50

*Baltimore Gas & Elec. Co. v. NRDC*,
  462 U.S. 87 (1983) .................................................................................22

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Engineers*,
  524 F.3d 938 (9th Cir. 2008) ..................................................................54

*Bicycle Trails Council of Marin v. Babbitt*,
  82 F.3d 1445 (9th Cir. 1996) ..................................................................43

*Buckingham v. Sec'y of U.S. Dep't of Agr.*,
  603 F.3d 1073 (9th Cir. 2010) ................................................................36

*California ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*,
  767 F.3d 781 (9th Cir. 2014) ..................................................................56

*California Trout v. FERC*,
  572 F.3d 1003 (9th Cir. 2009) ................................................................54

*City of Las Vegas, Nev. v. FAA*,
  570 F.3d 1109 (9th Cir. 2009) ........................................................ 35, 36

*City of Los Angeles, California v. FAA*,
  63 F.4th 835 (9th Cir. 2023) ..................................................................56

*City of Mukilteo v. U.S. Dep't of Transp.*,
  815 F.3d 632 (9th Cir. 2016) ..................................................................51

*Ctr. for Biological Diversity v. Ilano*,
  928 F.3d 774 (9th Cir. 2019) ..................................................................21

iii

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) ................................................................58

*Ctr. For Cmty. Action & Env't Just. v. FAA*,
61 F.4th 633 (9th Cir. 2023) ..................................................................21

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) ............................................................................3, 4

*Douglas Cnty. v. Babbitt*,
48 F.3d 1495 (9th Cir. 1995) ................................................................23

*Dubois v. U.S. Dep't of Agric.*,
102 F.3d 1273 (1st Cir. 1996) ..............................................................53

*Earth Island Inst. v. U.S. Forest Serv.*,
697 F.3d 1010 (9th Cir. 2012) ............................................... 54, 55, 56

*Ecology Ctr. v. Castaneda*,
574 F.3d 652 (9th Cir. 2009) ................................................................54

*Env't Prot. Info. Ctr. v. U.S. Forest Serv.*,
451 F.3d 1005 (9th Cir. 2006) ..............................................................38

*Ganoung v. Stiles*,
388 Mont. 152 (2017) ...........................................................................52

*Great Old Broads for Wilderness v. Kimbell*,
709 F.3d 836 (9th Cir. 2013) ................................................................35

*Headwaters, Inc. v. Bureau of Land Mgmt.*,
914 F.2d 1174 (9th Cir. 1990) .......................................................57, 58

*Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
545 F.3d 1147 (9th Cir. 2008) .................................... 35, 50, 55, 56, 58

*Kettle Range Conservation Grp. v. U.S. Bureau of Land Mgmt.*,
150 F.3d 1083 (9th Cir. 1998) ..............................................................60

*Kootenai Tribe of Idaho v. Veneman*,
313 F.3d 1094 (9th Cir. 2002) .......................................................26, 34

iv

*Laden v. Atkeson*,
   112 Mont. 302 (1941) ............................................................53

*LaFlamme v. FERC*,
   852 F.2d 389 (9th Cir. 1988) ........................................ 43, 44

*Leisz v. Avista Corp.*,
   340 Mont. 294 (2007) ............................................................53

*Metro. Edison Co. v. People Against Nuclear Energy*,
   460 U.S. 766 (1983) ...................................................... 43, 50

*Montana v. Haaland*,
   50 F.4th 1254 (9th Cir. 2022) ...............................................59

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................21

*Mountain Communities for Fire Safety v. Elliott*,
   25 F.4th 667 (9th Cir. 2022) ...............................................33

*Native Ecosystems Council v. U.S. Forest Serv.*,
   428 F.3d 1233 (9th Cir. 2005) ...................................... 51, 55

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
   241 F.3d 722 (9th Cir. 2001) ...............................................54

*Paradise Ridge Def. Coal. v. Hartman*,
   757 F. App'x 536 (9th Cir. 2018) .......................................57

*Plains Res. Council v. Lujan*,
   874 F.2d 661 (9th Cir. 1989) ...............................................58

*Protect Our Communities Found. v. LaCounte*,
   939 F.3d 1029 (9th Cir. 2019) .............................................29

*Provo River Coal. v. Pena*,
   925 F. Supp. 1518 (D. Utah 1996) ......................................42

*Reid v. Park Cty.*,
   192 Mont. 231 (1981) ...........................................................52

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ............................................................................... 3

*Se. Alaska Conservation Council v. Fed. Highway Admin.*,
649 F.3d 1050 (9th Cir. 2011) ............................................................ 59

*Sierra Club v. Espy*,
38 F.3d 792 (5th Cir. 1994) ................................................................ 56

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
100 F.3d 1443 (9th Cir. 1996) ............................................................ 36

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
608 F.3d 592 (9th Cir. 2010) ........................................... 27, 28, 29, 42

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
671 F.3d 1113 (9th Cir. 2012) ................................................ 4, 31, 36

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
435 U.S. 519 (1978) ..................................................................... 53, 57

*W. Watersheds Project v. Abbey*,
719 F.3d 1035 (9th Cir. 2013) ............................................................ 58

*Westlands Water Dist. v. U.S. Dep't of Interior*,
376 F.3d 853 (9th Cir. 2004) ....................................................... 57, 58

*WildEarth Guardians v. Conner*,
920 F.3d 1245 (10th Cir. 2019) .................................................... 27, 28

*Winter v. NRDC*,
555 U.S. 7 (2008) ............................................................................... 54

*Wisconsin v. Weinberger*,
745 F.2d 412 (7th Cir. 1984) .............................................................. 4

## Statutes

5 U.S.C. § 706 ........................................................................... 21, 59

7 U.S.C. § 6912(e) ........................................................................... 36

42 U.S.C. § 4332(2)(C) ....................................................................... 3

## Regulations

36 C.F.R. Part 220................................................................4

36 C.F.R. § 220.4(e)...........................................................34

36 C.F.R. § 220.6 ................................................................4

36 C.F.R. § 220.6(e)(1) ......................................................33

36 C.F.R. § 220.7(b)(2)......................................................55

36 C.F.R. § 214.20 ............................................................36

40 C.F.R. Part 1500.............................................................3

40 C.F.R. § 1501.2.............................................................26

40 C.F.R. § 1502.14(a).......................................................55

40 C.F.R. § 1502.5.............................................................27

40 C.F.R. § 1506.13 ............................................................3

40 C.F.R. § 1508.25(a)(3)..................................................32

40 C.F.R. § 1508.27 ..........................................................32

40 C.F.R. § 1508.27(b)(3)..................................................47

40 C.F.R. § 1508.4 ........................................................ 4, 33

40 C.F.R. § 1508.9 ......................................................... 3, 31

40 C.F.R. § 1508.4 ..............................................................4

## Other Authorities

85 Fed. Reg. 43,304 (July 16, 2020).................................3, 4

87 Fed. Reg. 23,453 (May 20, 2022). ...................................3

## GLOSSARY

CE                    Categorical Exclusion

CEQ               Council on Environmental Quality

EA                   Environmental Assessment

EIS                 Environmental Impact Statement

FONSI          Finding of No Significant Impact

MFWP          Montana Fish Wildlife and Parks

NEPA           National Environmental Policy Act

TPA               Travel Planning Areas

## INTRODUCTION

The Forest Service (Service) manages thousands of miles of trails on the Custer Gallatin National Forest (Forest), including the Crazy Mountain Range where public and private land often alternates in a checkerboard pattern resulting from railroad land grants in the late 1800s. This suit presents a public access dispute about two trails in the Crazy Mountain Range. Here, two trails between the Ibex and Porcupine trailheads crossed miles of private property, and while the Service believed it had unperfected easements for those trails, the private landowners (landowners) disagreed and interfered with public access. As the conflict persisted, the Service considered relocating portions of the trails to the east to correspond with final rights-of-way once they were determined (the Porcupine-Ibex reroute). The Service analyzed the environmental impacts of that proposal under the National Environmental Policy Act (NEPA) along with similar projects in an Environmental Assessment in 2009 (2009 EA) and accepted and responded to public comments. Plaintiffs did not comment or otherwise object then, and the Service adopted the proposal. After years of negotiation, the Service and landowners agreed to the reroute's precise location, which provides permanent trail access to the same trailheads and cabins as the prior trails and enhanced recreational opportunities. The Service provided another public comment opportunity to determine whether any new issues or changed conditions warranted

a new or supplemental NEPA analysis, and after reviewing the comments (including comments submitted by Plaintiffs), the Service concluded its prior NEPA analyses had adequately addressed the environmental issues of the reroute.

Plaintiffs sued in district court raising several claims under NEPA, the Federal Land Policy Management Act, and the National Forest Management Act. On appeal, Plaintiffs solely pursue their NEPA claims, forfeiting all other claims. Opening Br. 19 n.3. The district court correctly rejected the NEPA claims. The Service reasonably analyzed the reroute in its NEPA analyses, the record reveals that the Service considered the environmental consequences of the reroute, and the Service reasonably considered alternatives. Plaintiffs present no argument that the Service erred in its conclusion that this small project will not have a significant environmental impact under NEPA.

## STATEMENT OF JURISDICTION

The Service concurs with Plaintiffs' statement of jurisdiction.

## STATEMENT OF THE ISSUES

1.     Whether the Service analyzed the Porcupine-Ibex reroute in the 2009 EA when it identified the area in which the trail would be relocated and considered the environmental impacts of relocating the trail in that area?

2.     Whether the Service adequately considered the environmental consequences of the reroute based on the record?

3.      Whether the Service analyzed a reasonable range of alternatives?

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are in the Addendum following this brief.

## STATEMENT OF THE CASE

### A.    NEPA

"NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA requires that federal agencies prepare an environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). But most federal actions do not require an EIS. An agency may first prepare an Environmental Assessment (EA) to determine whether a proposal's effects would be significant. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004). An EA is "a concise public document" which "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare" an EIS. 40 C.F.R. § 1508.9.[1] If the "agency determines that

---

[1] The Council on Environmental Quality (CEQ)—the executive body charged by statute with implementing NEPA—recently updated its NEPA regulations at 40 C.F.R. Parts 1500-1508. 85 Fed. Reg. 43,304 (July 16, 2020); 87 Fed. Reg. 23,453 (May 20, 2022). Because the Service made the relevant decisions before September 2020, the agency relied on CEQ's prior regulations. 40 C.F.R. § 1506.13 (2021). All citations to CEQ's regulations in this brief refer to the regulations as codified at 40 C.F.R. Part 1500 (2019).

an EIS is not required" it issues "a 'finding of no significant impact' (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Pub. Citizen*, 541 U.S. at 757-58. Neither an EIS nor EA is required if a proposed project falls within a categorical exclusion (CE). 40 C.F.R. § 1508.4; 36 C.F.R. § 220.6. A CE covers "a category of actions [that] do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. §§ 1508.4, 1507.3.

When circumstances change or new information arises about a project after an EA has been prepared but before the agency has completed the action, an agency considers whether to supplement the EA. To require supplementation, the new information or changed circumstances must present a "seriously different picture of the likely environmental harms stemming from the proposed project." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) (quoting *Wisconsin v. Weinberger*, 745 F.2d 412, 416-17 (7th Cir. 1984)).

## B. Factual background

The Custer Gallatin National Forest (Forest) covers millions of acres of National Forest System land in southern Montana and parts of South Dakota. The

---

The Service also amended its own agency-specific NEPA regulations in November 2020, 85 Fed. Reg. 73,620-01 (Nov. 19, 2020), after the decisions at issue. All citations to the Service's NEPA regulations in this brief refer to the regulations applicable to the decisions as codified at 36 C.F.R. Part 220 (2019).

Forest has over 1,000 miles of road and well over 2,000 miles of trail. Federal Supplemental Excerpts of Record (FedSER) 1-FedSER-92. The Forest's road and trail system developed over time, influenced by factors such as land ownership patterns, use of Forest resources, legislation, recreation, and changes in public attitudes. 2-ER-203. The Forest includes the Crazy Mountains (Crazies).

Ownership of much of the Crazies is in a checkerboard pattern with alternating sections of public and private land, originating from land grants Congress made to the Northern Pacific Railway Company in the late 1800s and early 1900s. 2-ER-203. For years, the Service and members of the public have used several historical trails crossing both private and public lands to access National Forest System lands in the Crazies. The Service has maintained, signed, and managed many of those trails. The Service has acquired easements and recorded easement deeds for some of these trails that cross private lands, but not for others.

### 1.    The contested trails

The contested Porcupine-Lowline Trail #267 and North Fork Elk Creek Trail #195 are connected and in the southwest corner of the Crazies. The Service's challenged re-route affected both of these connected trails, but to very different degrees. *See* 4-ER-698-700. As revealed by the maps and explained below at pp.22-23, n.4, the reroute of the Porcupine-Lowline Trail is longer and more

significant than the minor changes to the North Fork Elk Creek Trail. Most of the reroute, and thus the center of this dispute, is along the Porcupine-Lowline Trail. *See, e.g.*, 4-ER-700. Thus, we focus the discussion on the Porcupine-Lowline.[2] 2-ER-151; 3-ER-328.

The old Porcupine-Lowline Trail ran about 10 miles between the Porcupine and Ibex trailheads and recreational rental cabins. 4-ER-698; 5-ER-911. Several miles of the trail crossed private lands. 4-ER-701-02. This trail appeared on the 1925 Forest Visitor Map and later maps, but the date of construction is unknown. 5-ER-911. "The trail route is highly variable through time, as indicated on the Forest Visitor Maps," and "[t]he location of the trail alignment itself has varied up to a mile over the decades." 5-ER-911-12, 914-23, 927; 1-FedSER-20-41. "[T]he Porcupine Lowline Trail has changed through time to a degree with logging, road construction, and lack of trail maintenance." 5-ER-912.

Historic records suggest that the trail has long been difficult to follow or identify. For example, in the late 1970s and early 1980s, trail assessment reports show that the trail was difficult to follow, needed signs, had at least a dozen trees across it, and had no trail tread in places. 1-FedSER-2-15. One report stated that there was "no evidence of hiker use." 1-FedSER-11. "In the 1990s, the alignment

---

[2]     To clarify, Plaintiffs' excerpted map at Opening Br. 8 depicts the entire North Fork Elk Creek trail, most of it on Forest System lands and unaffected by this project.

changes again," 5-ER-927, and by the late 1990s the trail again was difficult to find.  1-FedSER-17.  The ranger stated that he "could not even tell where the Porcupine trail began" and "it quickly disappeared in a private meadow."  1-FedSER-17.

In the early 2000s, the landowners began complaining about public use of the trail and started posting signs asserting "private property keep out," "no trespassing," and "trail closed."  1-FedSER-48, 43.  The Service tried to negotiate with the landowners about trail access and requested that they remove the signs.  1-FedSER-49-51.  When the Service tried to maintain the trail and add signs identifying the trail, the landowners informed the Service that they would remove any signs put up by the Service.  1-FedSER-52.  And the landowners installed a locked gate across the trail.  1-FedSER-53.  The landowners asserted that the Service lacked any historic right to use the trail.  1-FedSER-54.  They refused to remove their signs or locked gate.  1-FedSER-54.

When the Service analyzed the trail in 2018, it found that it was "difficult to identify the intact historic portions of the trail."  5-ER-912.  "The portion of the trail from Section 15 south to Section 2 is on private land and has not been accessible/maintained for over 10 years, most likely much longer."  5-ER-912.  "[T]here are large segments on the private land that are completely unrecognizable

as trail.  This has been the case for over a decade."  5-ER-912.  Natural

deterioration and erosion were also occurring.  5-ER-912.

### 2. The 2006 EIS and Travel Plan

While the Service attempted to negotiate for public access with the

landowners, the Service prepared an EIS and the Gallatin National Forest Travel

Management Plan (Travel Plan) for the Gallatin Forest, issued in 2006.  The Travel

Plan identified and established opportunities for public recreation and access using

the Forest's road and trail system.  1-FedSER-73.  In developing the Travel Plan,

the Service comprehensively evaluated public recreation and travel demands along

with other resource uses and land stewardship needs.  1-FedSER-73, 78, 81.  The

EIS presented seven alternatives seeking to "provide for public recreation travel on

the Forest while correcting or preventing unacceptable impacts to other resources."

1-FedSER-102.  The EIS thoroughly examined the impacts of the alternatives'

changes to roads and trails on many interests, including among others:  recreation,

big game, general wildlife, social impacts, fisheries, and aquatic resources.  1-

FedSER-89-95.

The alternative ultimately adopted by the Service identified one of its

objectives as "[p]erfect[ing] trail access across private inholdings in the southwest

corner of the Crazies," including:  "Porcupine Lowline #267" and "North Fork Elk

Creek #195." 2-ER-157, 179.[3]  The alternative identified these two trails as open to uses like hiking, snowshoeing, and mountain biking, with motorcycles allowed seasonally on Porcupine Lowline.  2-ER-183, 250.

The Service adopted the Travel Plan, focusing on recreational opportunities and resource protection.  2-ER-208-09, 216-19.  For the area including the relevant trails, the Service largely based its decision "on attempting to provide for a variety of uses and experiences within the [Crazy] mountain range as a whole."  2-ER-249; *see also* 2-ER-324 (map of relevant area).  The Service also acknowledged the need to "negotiate an easement for portions of this trail that pass through private land.  We will also be looking for ways to re-route this trail to get more of it on national forest land."  2-ER-250.  Thus, the Travel Plan informed the public that the Service intended to secure easements for the relevant trail and to reroute the trail.

The Service also included objectives in the Travel Plan to improve access in this area.  "Objective 1-2 targets securing easements through private land on roads and trails designated for public use."  2-ER-250; 2-ER-171.  But as the Service explained in response to an administrative appeal from the landowners, the Travel Plan, "in and of itself, does not establish nor perfect access rights."  3-ER-330.

---

[3]     The Service divided the Forest into 39 "Travel Planning Areas" (TPAs) for analysis, and these trails are in the Ibex TPA.  2-ER-134.

In the Record of Decision for the Travel Plan, the Service found that the Travel Plan would best serve recreational needs. 2-ER-287-93. While the Plan reduced motorized use, the Service explained that "participation in non-motorized activity exceeds that of motorized activity," and the changes adopted serve the growing demand for other recreational opportunities. 2-ER-288.

The Service also considered the impacts of the Travel Plan on the natural environment that were analyzed in the EIS. The Service found that the Travel Plan "would not result in unacceptable impacts to big game populations" and that those populations were already healthy and exceeding goals. 2-ER-265-67. Similarly, with respect to wildlife in general, the Service found that the populations on the Forest were healthy, and the Plan would improve conditions for wildlife. 2-ER-378-79. And the Service concluded that the Travel Plan would improve aquatic habitats and "lead to improved fisheries habitat conditions across the Forest." 2-ER-271-74.

### 3. The 2009 EA and FONSI

As part of implementing the Travel Plan, the Service prepared a site-specific EA for road and trail improvement projects (2009 EA). 3-ER-398. In 2008, the Service began scoping for that EA and invited public comments. 3-ER-372; 3-ER-576. Among many proposals, the Service proposed "to relocate portions of the Porcupine-Lowline Trail #267 between the Ibex and Porcupine trailheads to

10

correspond with final rights-of-way.  Some portions of the trail may be shifted onto National Forest land to the east."  3-ER-383.  As discussed below at pp.24-25, this notice attached maps showing the area to which portions of the trail would be relocated.  3-ER-600-01.

In the 2009 EA, the Service explained that the Travel Plan had already considered the "types of uses to be allowed and managed for on each road and trail."  3-ER-403.  "[T]he improvement work now being proposed is designed to provide adequate facilities to accommodate the designated uses and provide for other resource protection."  3-ER-403.  The Service sought to, among other things: "decide whether to construct and reconstruct trails where needed to accommodate the uses designated through the Travel Plan, and if so, in what location and with what stipulations."  3-ER-406.  The Service identified two alternatives for analysis—the proposed action and no action alternatives.  3-ER-407.

Consistent with the scoping notice, the 2009 EA indicated that, under the Service's proposal for the "porcupine area," "portions of the Porcupine-Lowline Trail #267 between the Ibex and Porcupine trailheads would be relocated to correspond with final rights-of-way" and "[s]ome portions of the trail may be shifted onto National Forest land to the east."  3-ER-413; *see also* 4-ER-612.  The Service explained that this proposal would involve construction of "miles of new trail," as well as reconstruction and maintenance of other miles of the trail.  3-ER-

11

414. Along with this written description, the Service again attached two maps depicting the proposal and a corridor between the trailheads within which portions of the Porcupine-Lowline trail would be relocated. 3-ER-600-01. Thus, the 2009 EA depicted the proposal for the Porcupine-Ibex reroute, but because the Service had not determined the precise location of the eventual rights-of-way, it did not depict a precise route.

The EA analyzed all the proposed activities—including this trail relocation—and found the proposal overall increased core habitat for wildlife and had other benefits. 3-ER-431-34, 477-78. The EA also identified various measures designed to minimize any impacts on environmental resources, such as wildlife, fisheries, or aquatic resources. 3-ER-426-28, 437-38, 462-63. The 2009 EA also addressed environmental issues raised by the relocation of this specific trail. The EA considered potential impacts of the proposal in the Porcupine area to fisheries, including stream crossings and wetlands. 3-ER-457. The Service responded to a comment about potential impacts to streams and Yellowstone cutthroat trout. 4-ER-623. The 2009 EA considered how "[r]elocation" of this trail would impact biodiversity. 3-ER-442. The 2009 EA also responded to comments submitted during the scoping process, including two comments about this specific proposal. 3-ER-578-99.

The Service published the EA and provided over 30 days for public comment. 4-ER-670. The Service received one comment, and as relevant to the challenged trail, that comment solely urged the agency to avoid negative impacts to streams and Yellowstone cutthroat trout. 4-ER-677. The Service responded that it would take steps to avoid any such impact. 4-ER-677. Plaintiffs did not submit any comments on the 2009 EA or in response to the scoping notice.

Based on the 2009 EA, the Service decided to adopt the proposed action (with a minor exception not relevant here), proceed with the identified projects, and issued a FONSI. 4-ER-638, 641-42. The Service decided to relocate the trail to correspond with final rights-of-way, as described in the scoping notice and 2009 EA. 4-ER-647. The Service found that the overall proposal would have no significant negative impacts and would benefit general wildlife, fisheries, and biodiversity. 4-ER-663-65. The Service concluded that the proposal, including the Porcupine-Ibex reroute, would not have a significant impact on the environment under NEPA. 4-ER-671-74.

### 4. Implementing the Porcupine-Ibex reroute

Over the following years, the Service continued to negotiate with the landowners and to consider how to perfect access in this area. *See, e.g.*, 1-FedSER-56-69. Other priority access needs and ongoing negotiations with the landowners delayed implementation of the Porcupine-Ibex reroute, though by 2019

the Service had implemented 51 of the projects analyzed in the 2009 EA. 2-FedSER-343.

In March 2018, after reaching a tentative agreement with the landowners, the Service published another scoping packet for the proposed Porcupine-Ibex reroute showing the precise location of the proposed reroute—within the area identified on the map attached to the 2009 EA. 4-ER-697, 700. The agency provided this additional comment period "to determine if there are any new significant issues or changed conditions that would warrant a new or supplemental NEPA analysis." 5-ER-909. Consistent with both the Travel Plan and 2009 EA, the purpose of the project was to "provide quality recreation opportunities on National Forest System lands on the western side of the [Crazies] and to resolve a longstanding dispute along the Porcupine Lowline trail #267." 4-ER-698. The reroute would "establish trail connectivity between the Porcupine and Ibex Forest trailheads and recreation rental cabins." 4-ER-698. The reroute would be "parallel to the Porcupine Lowline" and "provid[e] access to Campfire Lake via Elk Creek." 2-FedSER-345. The reroute would obtain permanent easements over private lands and construct 8 miles of new trail on Forest lands. 4-ER-698. After recording the new easements, the Service would relinquish certain interests on the old trails. 4-ER-698. The notice included a map of the proposed reroute and the Service's interests to be relinquished. 4-ER-700.

14

The Service provided 30 days for the public to comment on the reroute. 4-ER-699. The Service explained that, if "based on scoping, … it is uncertain whether the proposed action may have a significant effect on the environment," the agency would "prepare an EA." 4-ER-705.

The Service received over 80 comments, many of which commended the Service for resolving a years-long dispute while preserving public access. 4-ER-762-64, 773-74, 779, 794, 796, 806-07, 811, 814, 816, 836, 838, 840, 845-46, 849-51, 855-57, 862-64, 870-71, 879, 890. Even some commenters who disagreed with aspects of the decision supported the overall reroute. *See, e.g.*, 4-ER-884. The Service reviewed, considered, and summarized all comments, including comments submitted by Plaintiffs about the decision to reroute, which Plaintiffs never raised during the 2009 administrative process on whether to relocate the trail. 5-ER-898-907.

In August 2018, the Service "decided to proceed with the trail reroute." 5-ER-909. The Service noted that a trail reroute in this location had been considered in the 2006 EIS for the Travel Plan and "this specific trail relocation" was analyzed in the 2009 EA and decision. 5-ER-909. "Based on a review of all comments received in this latest public scoping, [the Forest Supervisor] determined that [the Service's] past two environmental analyses and decisions have adequately addressed public issues and resource effects of the trail re-route." 5-ER-910.

15

Considering comments from Montana Fish Wildlife and Parks (MFWP) and the need to negotiate with the landowners, the Service decided to proceed with this reroute as a nonmotorized trail, ending motorcycle use on the trail. 5-ER-909-10.

After the Service decided to proceed, the landowners donated recorded easements for the portions of the rerouted trail crossing private land to the Service. 5-ER-941-53. After obtaining the easements for the new trail, the Service determined that it no longer needed to claim an easement for the old trail over landowners' property. 5-ER-941. Therefore, the United States released to the landowners "any easement interests it may have" as depicted on the attached map. 5-ER-941-43. Construction of the rerouted trail was completed in 2021.

## C. Proceedings below

In June 2019, Plaintiffs sued the Service, and Plaintiffs later amended the complaint to include the landowners as defendants. 5-ER-1060. Plaintiffs' complaint described Plaintiffs as organizations dedicated to public access to public land and which sought to have the Service maintain the old trails. Plaintiffs requested that the court void the property transactions and vacate the Service's decision to proceed with the trail reroute. The Service filed an administrative record, and Plaintiffs moved to add certain materials and to strike others. The court granted this motion in part. After completion of the administrative record, the parties cross-moved for summary judgment, and the magistrate judge issued

16

thorough findings and recommendations that the Service's motion be granted. 1-ER-23-50. Plaintiffs filed objections and the Service responded. As relevant to this appeal, the district court rejected each of Plaintiffs' NEPA arguments. 1-ER-15-20.

First, the court found that the Service had analyzed the Porcupine-Ibex reroute in the 2009 EA. 1-ER-15. As the court explained: "[b]ecause the Forest Service was still negotiating with the landowners, it did not know the precise location of the trail reroute. Nevertheless, two maps were distributed during scoping and attached to the 2009 EA, which showed the area of the proposed reroute." 1-ER-8. The court found "the description of the Porcupine-Lowline trail reroute is sufficiently descriptive to inform the public. It gives a corridor where the reroute is expected to occur and notifies the public that the trail may be shifted east in places and will require approximately 8 miles of trail work." 1-ER-16.

Second, the court ruled that the 2009 EA sufficiently analyzed environmental impacts from the reroute. 1-ER-16. The Service had taken a "'hard look' at environmental considerations" by analyzing "impacts to stream crossings, Yellowstone cutthroat trout, sensitive species, and address[ing] public comments to that end." 1-ER-17. The court found this analysis sufficient because the "project is substantially the same as, and included within, the described Porcupine work area." 1-ER-17. The court rejected Plaintiffs' argument that "the [Porcupine-]Ibex

17

reroute demands specific analysis" because Plaintiffs "provide[d] no support for that proposition or authorities requiring such granular scrutiny." 1-ER-17.

Finally, the court concluded that the Service had "considered appropriate and reasonable alternatives under NEPA." 1-ER-18. The court found that the Service had provided reasons for analyzing two alternatives—the proposed action and the no action alternatives. 1-ER-18-19. The court explained that, because the alternatives were limited by "what easements could be secured or negotiated," the Service reasonably did not analyze additional alternatives. 1-ER-19. The court granted summary judgment to the Service and Plaintiffs appealed. 1-ER-22.

## SUMMARY OF ARGUMENT

1.    The Service analyzed the Porcupine-Ibex reroute in the 2009 EA and provided a description of the project sufficient to notify the public of that proposal. The 2009 EA states that portions of the Porcupine-Lowline Trail between the Ibex and Porcupine trailheads would be relocated to correspond with final rights-of-way, and the EA indicated that the trail may be moved east to place more of it on the Forest. The Porcupine-Ibex reroute does precisely those things. Both the scoping notice and 2009 EA attached maps depicting the proposal and identifying the area for the reroute, and Plaintiffs do not dispute that the final reroute falls within the areas depicted on the maps. Here, ongoing negotiations with the landowners created inherent uncertainties about the precise location of the reroute,

18

but the Service identified the area where the reroute would occur and the environmental impacts from a reroute in that area. The Service reasonably analyzed the environmental impacts based on the available information and used effective mitigation measures and standards to account for uncertainties about the precise location of the reroute. This Court has repeatedly upheld NEPA analyses where the agency reasonably analyzed the environmental impacts of a proposal despite uncertainty about the precise locations and sites of the final implementation of the project, and it should do so here.

2.     The Service analyzed the Porcupine-Ibex reroute and found that it would not have a significant impact on the environment. The Service considered potential impacts to big game species and wildlife and reasonably concluded that the projects analyzed in the 2009 EA would generally have beneficial effects. Plaintiffs' characterization of the potential negative effects of the trail reroute is not borne out by the record, which reveals that wildlife tend to habituate to predictable uses in predictable locations, such as travel on the trail. The Service considered fisheries and aquatic resources, including potential impacts from this specific reroute, and the Service adopted reasonable mitigation measures to ensure no significant adverse impacts. With respect to recreation, NEPA only requires agencies to analyze impacts to the physical environment—not, for example, every change to subjective visitor experience that may result from changed recreational

19

opportunities.  In any event, the Service thoroughly considered recreation and reasonably concluded that the reroute would provide enhanced recreational opportunities.  Finally, the question of whether any asserted easements created by railroad deeds exist in the project area is irrelevant.  On appeal, Plaintiffs have limited themselves to NEPA claims about the proper NEPA procedure; Plaintiffs' failure to explain how the railroad deeds are relevant to the analysis of environmental impacts is fatal to the claim they have presented on appeal.  And in any event the district court correctly found Plaintiffs failed to develop this issue adequately to require a response from the Service.

3.     The Service properly considered two alternatives in the EA:  the proposed action and the no-action alternative.  An agency's obligation to consider alternatives in an EA is lower than in an EIS, and this Court has repeatedly upheld EAs examining two alternatives.  And it makes little sense to require an agency to analyze yet more alternatives when it has properly determined that the chosen alternative will have no significant environmental impact.  Even in the context of an EIS, a party challenging an agency's failure to consider an alternative must show that the alternative is viable.  Plaintiffs do not even describe what alternatives they wished for the Service to analyze with specificity, much less establish that they are viable.

## STANDARD OF REVIEW

This Court reviews the district court's summary judgment ruling de novo, but the agency's "[c]ompliance with NEPA is reviewed under the Administrative Procedure Act [APA]." *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 779 (9th Cir. 2019) (citation omitted). "Under the APA, a court may set aside an agency action if the court determines that the action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 779-80 (cleaned up); 5 U.S.C. § 706. Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if it is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "As the party challenging the administrative decision, [Plaintiffs] bear the burden of persuasion here…. [E]ven assuming the agency made missteps, the burden is on [Plaintiffs] to demonstrate that the agency's ultimate conclusions are unreasonable." *Ctr. For Cmty. Action & Env't Just. v. FAA*, 61 F.4th 633, 639-40 (9th Cir. 2023) (cleaned up).

**ARGUMENT**

**I.      The Service complied with NEPA.**

NEPA serves the dual purpose of ensuring that federal agencies consider significant environmental impacts of a proposed action and inform the public of the analysis. *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983).  The Service reasonably analyzed the potential environmental impacts of the Porcupine-Ibex reroute—along with many other projects—in the 2009 EA, notified the public of the analysis, and provided multiple opportunities for public comment.  4-ER-647, 670.  The Service reasonably concluded that the reroute would not have a significant impact on the environment requiring an EIS.  4-ER-671-74.

**A.      The Service analyzed the Porcupine-Ibex reroute in the 2009 EA.**

As the district court found, the Service analyzed the Porcupine-Ibex reroute in the 2009 EA and provided a description of the project sufficient to notify the public of that proposal.  1-ER-16.  The 2009 EA states that, under the proposed action, "portions of the Porcupine-Lowline Trail #267 between the Ibex and Porcupine trailheads would be relocated to correspond with final rights-of-way." 3-ER-413.[4]  The Porcupine-Ibex reroute does precisely that.  *See* 5-ER-936; 2-

---

[4]      As discussed above, the Porcupine-Ibex reroute relocates the Porcupine-Lowline Trail #267 and a small portion of the North Fork Elk Creek Trail #195.  4-ER-700.  Plaintiffs have never developed any argument as to how the minor changes to the North Fork Elk Creek Trail could yield impacts that are different in

FedSER-349 (explaining that project would be on Forest lands "with permanent easements secured where the proposed new trail crosses private lands"). The 2009 EA also states that "portions of the trail may be shifted onto National Forest land to the east," 3-ER-413, and the Porcupine-Ibex reroute shifts portions of the trail onto the Forest to the east, 5-ER-936. The 2009 EA explains that the proposal would involve construction of several miles of new trail, reconstruction of other miles, and maintenance on yet others. 3-ER-414. The Porcupine-Ibex reroute constructs, reconstructs, and maintains the rerouted trail, as proposed. *See* 5-ER-936; 2-FedSER-434 (discussing construction of new trail and maintenance on miles of old trail). And the EA and decision connected the relocation of the trail to determination of "final rights-of-way" and thus disclosed that the precise location depended on the final easements. *See* 3-ER-413; *see also* 3-ER-582 (comment supporting proposal "provided an easement can be obtained or the trail can be relocated").[5]

---

kind or greater in magnitude than the effects of the more extensive route changes to Porcupine-Lowline, so we focus on the Porcupine-Lowline Trail.

[5] Thus, Plaintiffs are incorrect (Opening Br. 32) that the EA failed to reveal that property interests were at issue. In any event, as explained below at Part I.B.4, NEPA only requires analysis of impacts to "the physical environment—the air, land, and water." *Douglas Cnty. v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995). Thus, the EA focused on physical environmental impacts of the reroute; NEPA does not require a separate analysis of property interests.

The 2008 scoping notice for the 2009 EA had described the proposal in almost identical terms to those in the EA.  3-ER-383.  Along with these written descriptions, the Service attached two maps depicting the proposal to both the 2008 scoping notice and the 2009 EA.  3-ER-600-01.  We present a portion of one of those maps on the next page:



3-ER-600.  Thus, the 2009 EA depicted the proposal and identified the area for the

reroute, as well as the beginning and end points of the reroute.  Plaintiffs do not

dispute that the final reroute falls within the corridor depicted on the map.  *See* 5-

ER-932 (map of reroute).  This Court has upheld an agency's reliance on maps

25

despite plaintiffs' assertion that the maps were inadequately detailed when, as here, "plaintiffs cannot seriously dispute that they had actual notice as to the … areas that would be affected." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1117 (9th Cir. 2002), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).

In 2009, the Service adopted this proposal in relevant part in a final decision and issued a FONSI. 4-ER-634, 647. In that decision, the Service stated that "portions of the Porcupine-Lowline Trail #267 between the Ibex and Porcupine trailheads *will be relocated* to correspond with final rights-of-way." 4-ER-647 (emphasis added). Contrary to Plaintiffs' characterization, that language is not "aspirational in nature" (Opening Br. 30); it was definitive that the Service had, after completing its NEPA analysis, decided to relocate the trail.

Plaintiffs contend that the 2009 EA cannot be sufficient because "the specific location and design of a new, relocated trail was not known or included." Opening Br. 31. As the district court explained, the Service "did not know the precise location of the reroute" because it "was still negotiating with the landowners." 1-ER-8. The agency reasonably chose to prepare the EA and provide an opportunity for public comment *early* in the process, *before* negotiating the final rights-of-way; this approach allowed the environmental analysis and public comment to inform the agency's actions. *See, e.g.*, 40 C.F.R. § 1501.2

("Agencies shall integrate the NEPA process with other planning at the earliest possible time."); 40 C.F.R. § 1502.5 (EIS should be "prepared early enough so that it can serve practically as an important contribution to the decision-making process"). Thus, the Service reasonably balanced the interest in an early analysis to inform negotiations against some lack of detail in the proposal. This approach also allowed the Service to analyze multiple similar proposals together, as discussed below.

An agency "may adapt its assessment of environmental impacts when the specific locations of a[] … project's activities cannot reasonably be ascertained until some time after the project is approved." *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 600 (9th Cir. 2010). Indeed, this Court has repeatedly upheld NEPA analyses where the agency reasonably analyzed the environmental impacts of a proposal despite uncertainty about the precise locations and sites of the final implementation of the project. *See id.*; *see also*, *e.g.*, *N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1095 (9th Cir. 2020) (finding EIS covered leasing despite failure to analyze "particular tracts of land for leasing, let alone alternative proposals that vary by location, amount, or timing"). The Tenth Circuit has also upheld a NEPA analysis when an agency had a "valid reason for not identifying specific treatment [locations]." *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019). The agency need

27

"not postpone[] the requisite environmental analysis until it picks the specific sites for … the Project." *Id.* The question is whether the environmental analysis addresses the impacts of "whatever sites it ultimately chooses (within the constraints imposed by the Project)." *Id.*

"NEPA's ultimate focus is on the assessment of environmental impacts and a project's details are usually a means to that end." *Te-Moak Tribe*, 608 F.3d at 600. As in *Te-Moak Tribe*, here the precise location of the reroute "inherently involve[d] uncertainties" about how and where the agency would ultimately establish final rights-of-way. *Id.* But with the available information about the proposed trail, the agency "assessed the potential impacts … that might occur throughout the project area." *Id.* And the Service addressed uncertainty about the precise location by adopting "effective avoidance and mitigation measures to account for unknown impacts." *Id.*

The 2009 EA and decision specified the design criteria that would ensure consistency with the EA and its analysis of environmental impacts, including the type of work authorized, standard operating procedures, mitigation measures, and monitoring protocols. 3-ER-423-30; 4-ER-660-63. Thus, contrary to Plaintiffs' assertions (Opening Br. 31-32, 61), the EA and decision specified many of the design requirements for the trail. When implementing the project, an interdisciplinary team analyzed the final layout of the reroute to evaluate impacts

and adopt appropriate standard operating procedures and mitigation measures using those specified in the 2009 EA and decision. 2-FedSER-347-65. Under those terms, the Service completed additional specialist checklists and consulted the U.S. Fish and Wildlife Service and the State Historic Preservation Office, confirming that the reroute would not entail any unacceptable environmental effects. 2-FedSER-347-65, 415-39; 5-ER-934. Thus, as in *Te-Moak Tribe*, the agency reasonably analyzed the environmental impacts "without knowing the precise locations of … project activities" by adopting and following reasonable measures to address any resulting uncertainties. 608 F.3d at 601; *see also Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029, 1035 (9th Cir. 2019) (upholding reliance on NEPA analysis even though final decisions on turbine locations depended on implementation of mitigation measures).

Plaintiffs downplay the 2009 EA and decision, stating that it "solely" implements the 2006 Travel Plan and "cannot include *new* projects." Opening Br. 29. But the Service performed additional NEPA analysis to review projects not fully addressed by its prior EIS; the 2009 EA was not a paperwork exercise. While the Travel Plan had "specified the types of uses to be allowed and managed for on each road and trail," the Service sought to analyze projects "to provide adequate facilities to accommodate the designated uses." 3-ER-406. The Service explained that it was not revisiting the broad decisions about use made in the Travel Plan. 3-

ER-404. But the EA identified one of the decisions to be made as "*whether* to construct and reconstruct trails where needed to accommodate the uses designated through the Travel Plan, and if so, in *what location* and *with what stipulations*." 3-ER-404 (emphases added). The Service explained that "these decisions revolve around the physical function and *location* of a road or trail, and there are no proposed changes to the amount, type or *general* location of recreation activities provided by" the Travel Plan. 3-ER-393 (emphases added). Thus, the Service made new decisions about the location of trails, without revisiting the broader decisions made in the Travel Plan. This description in the 2009 EA aligns with the Porcupine-Ibex reroute, which modified the precise location of the trail (within a then-existing band of uncertainty) but did not change the "general location of recreation activities" contemplated by the Travel Plan.

Plaintiffs also mischaracterize the EA, claiming that the agency "emphasized that the Porcupine Lowline trail in its *existing location* as detailed in the 2006 travel plan would remain authorized" for certain uses "and needed to be 'remarked and reconstructed.'" Opening Br. 31 (quoting 3-ER-413). This assertion combines two separate sentences and reverses the meaning of the EA. In one sentence, the EA states that: "*Currently*, the trail passes through large portions of private lands with fences, gates, past harvest and road building and needs to be remarked and reconstructed." 3-ER-413 (emphasis added). That sentence describes the

Service's understanding of the then-current status quo and does *not* describe the proposed action. *See also* 3-ER-582 (explaining that Service "intend[ed] to continue to maintain the route for existing uses as it has in the past *until a relocation resolution agreement* has been reached") (emphasis added). The proposed action was that "portions" of the trail "would be relocated to correspond with final rights-of-way"—changing the status quo. 3-ER-413. The other sentence Plaintiffs rely on states that, under the Travel Plan, "this trail is to provide opportunities for motorcycle, mountain bike, stock and foot use." 3-ER-413. But that sentence says nothing about the final location of the trail, much less contradicts the Service's statement that it would relocate the trail.

### B. The Service reasonably analyzed the Porcupine-Ibex reroute and found that it would not have a significant impact on the environment.

"The purpose of an EA under NEPA is not to amass and disclose all possible details regarding a proposal, but to create a 'concise public document' that serves to '[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI].'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012) (quoting 40 C.F.R. § 1508.9). The Service prepared the 2009 EA to analyze the effects of the Porcupine-Ibex reroute alongside the effects of many other projects across the Forest. 3-ER-404-06. The Service reasonably chose to analyze the environmental effects of multiple projects

31

collectively because they all related to "improvement work on certain [Forest] roads and trails." 4-ER-638. The NEPA regulations encourage agencies to consider similar projects together when doing so provides "the best way to assess adequately the combined impacts of similar actions." 40 C.F.R. § 1508.25(a)(3). In the 2009 EA, the Service took a "hard look" at the environmental consequences of the combined projects on many resources, including general wildlife, fisheries, and sensitive species. 3-ER-431-575. The EA also repeatedly tiered to and incorporated the EIS for the Travel Plan. *See, e.g.*, 3-ER-407. The EA explained that the social, economic, and recreational impacts had been adequately addressed in the Travel Plan and the EIS. 4-ER-626, 628; *see also* 3-ER-393.

The Service then issued a decision and FONSI adopting the analyzed projects, including the Porcupine-Ibex reroute. The Service found that "implementation of the road and trail projects, with included mitigation, will not result in unacceptable environmental effects and, for many resources, will result in beneficial effect." 4-ER-642. After reviewing "the direct, indirect and cumulative effects of the proposed activities" in the EA, the Service applied the regulatory definition of "significant" and "determined that these actions will not have significant impacts on the quality of the human environment." 4-ER-671; 40 C.F.R. § 1508.27.

32

The Service also explained that under "the Forest Service Handbook," these types of "projects fit into categories of actions that have routinely been found not to have significant effects on the human environment and therefore do not require preparation of an EA or an EIS." 4-ER-672. As relevant here, the Service was referring to its categorical exclusions (CEs) for the "[c]onstruction and reconstruction of trails" and the "maintenance of … trails." 36 C.F.R. § 220.6(e)(1), (d)(4). The Porcupine-Ibex reroute falls within the plain terms of these CEs, as it involves the construction, reconstruction, and maintenance of a trail. 3-ER-414, 4-ER-698. Agencies use CEs to identify "a category of actions which do not individually or cumulatively have a significant effect on the human environment," 40 C.F.R. § 1508.4, and the Service adopted its CEs "after public review and comment and in consultation with CEQ." *Mountain Communities for Fire Safety v. Elliott*, 25 F.4th 667, 675 (9th Cir. 2022). Thus, the EA's conclusion that the reroute will not have significant impacts is supported by the Service's earlier regulation finding that projects like this one generally do not have a significant environmental impact. The Service had authorized many recent trail projects relying on these CEs. 4-ER-706.

The Service initially reached this determination after two rounds of public comment. 4-ER-670. The Service properly scoped the Porcupine-Ibex reroute in 2008 by providing adequate notice of the proposal and engaging in a meaningful

dialogue with the public. *See Kootenai Tribe*, 313 F.3d at 1117; 36 C.F.R.

§ 220.4(e). Two commenters raised concerns about this proposal, including one

comment about environmental impacts, and the Service responded. *See* 3-ER-396,

582, 591, 596. Plaintiffs did not comment at either the scoping stage or on the EA,

nor did Plaintiffs file objections or an administrative appeal.

When the Service reached a tentative agreement with the landowners about

the reroute, the Service again scoped the project and provided an additional

"comment period … to determine if there are any new significant issues or

changed conditions that would warrant a new or supplemental NEPA analysis." 5-

ER-909. Under the Forest Service Handbook, the Service uses scoping, in part, to

assess "whether or not a valid decision already exists. If a decision has already

been made to authorize an action in a specific area, …. a new decision may not be

necessary." 4-ER-715 (Handbook 1909.15, ch.10, § 11.23). If new information

does not require a new analysis, and if "the previous analysis and decision are still

valid," then the agency should "implement the decision." 4-ER-715 (Handbook

1909.15, ch.10, § 11.23).

After reviewing the comments on the second round of scoping, the Service

reasonably concluded that its prior environmental analyses—the Travel Plan EIS

and 2009 EA—and decisions had "adequately addressed public issues and resource

effects of the trail re-route." 5-ER-910. Even when an agency modifies a project,

it may rely on an earlier NEPA analysis if it reviews the new information and concludes that "there [are] no new impacts that [are] significantly different than those already considered." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1155 (9th Cir. 2008); *City of Las Vegas, Nev. v. FAA*, 570 F.3d 1109, 1117 (9th Cir. 2009); *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 854 (9th Cir. 2013). Here, the Service did not even modify the proposal but just provided more precise details, and the Service could reasonably conclude that there were no new impacts that had not already been considered.

The Service's conclusions that the Porcupine-Ibex reroute would not have a significant impact on the environment and that the Service had adequately considered the issues raised in the last round of comments find ample support in the record. As revealed by the map of the reroute, it moves the trail generally 1 mile or less to the east, runs parallel to the earlier alignment, and connects the same recreational areas. 5-ER-936. Such minor changes are generally not significant impacts to the environment. And as identified by the Service's CEs, constructing trails generally has no significant environmental impact; even "wildlife species create trails on which they move across the landscape in repeated patterns, so trails are not new to the natural environment." 2-FedSER-313; *see also, e.g.*, 1-FedSER-226 (explaining that trails have little direct impact on the environment). The Service also modified the trail by eliminating motorcycle use

35

on it, and the record contains ample evidence that eliminating motorized use *reduces* various environmental impacts. *See, e.g.*, 3-ER-580.

Plaintiffs do not directly challenge the Service's determination that no new information had become available since 2009 that required a new or supplemental NEPA analysis. *See Tri-Valley CAREs*, 671 F.3d at 1130 (supplementation required only when new information or changed circumstances "show a 'seriously different picture of the likely environmental harms stemming from the proposed project'") (citation omitted). Instead, they argue that the 2009 EA analysis was itself inadequate. But by failing to submit any comments in response to the original scoping notice or the 2009 EA, Plaintiffs forfeited their right to challenge the sufficiency of the EA based on issues they could have raised at that time. *See* 7 U.S.C. § 6912(e); 36 C.F.R. §§ 214.20, 218.14; *Buckingham v. Sec'y of U.S. Dep't of Agr.*, 603 F.3d 1073, 1080 (9th Cir. 2010); *City of Las Vegas*, 570 F.3d at 1114. Moreover, in a belated challenge to the sufficiency of the NEPA analysis, Plaintiffs improperly rely extensively on four declarations of over 70 pages of material *never* submitted to the agency, written in 2021, long after the agency made the decision. *See, e.g.*, Opening Br. 4, 9-10, 31, 37-39, 55, 62-63; 5-ER-980-1053 (declarations). The Court should not consider those materials in resolving the claims on appeal because those materials are not in the administrative record for the challenged decision and thus may not be used to "attack" the agency's decision. *See Sw. Ctr.*

*for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).[6]

Regardless of these threshold defects, however, Plaintiffs' arguments fail on the

merits because the Service adequately considered the environmental impacts of the

Porcupine-Ibex reroute in accordance with NEPA.

### 1. The Service considered potential impacts to big game species and wildlife.

The Service analyzed potential impacts to big game species and wildlife in

the 2009 EA, incorporated the earlier analysis in the EIS by reference, and adopted

standards and mitigation measures to address any potential impacts.  3-ER-462-79,

469; 4-ER-660-63, 665 (standards and mitigation); 1-FedSER-103-180.  The

Service reasonably found that the "potential negative consequences to wildlife

from" the projects analyzed in the EA are "not significant," and the projects were

"superior to the alternative of doing nothing."  4-ER-665, 668-69.  The Service

found that overall, the projects were "beneficial to wildlife" because "[c]ore

habitat" would increase.  3-ER-477; *see also* 2-FedSER-342 (showing that Travel

Plan reduces route density in this hunting district (315) and increases security

area).  And the projects ensured that human travel would "primarily be focused on

---

6   In district court, Plaintiffs relied on these declarations for a different claim involving an alleged "failure to act" with respect to different trails.  2-FedSER-441-44.  Because no defined administrative record existed for that claim, the government did not move to strike them, but that does not mean Plaintiffs can now use them for the claims on appeal where there is an administrative record.

designated routes … , and wildlife can tend to habituate to predictable uses in predictable locations." 3-ER-477. The record reveals that eliminating motorized use on routes (as here) benefits big game species and wildlife. *See, e.g.*, 3-ER-453, 580; 1-FedSER-159, 227. The Service also considered potential impacts to biodiversity, wolverines, and other sensitive wildlife species. 3-ER-436-54, 4-ER-550-55, 561-72, 668-69; 2-FedSER-312-25.

Plaintiffs' contrary account (Opening Br. 54-56) of the potential impacts of the reroute on wildlife and big game species lacks support. "NEPA regulations direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species," *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1010 (9th Cir. 2006), and Plaintiffs' reference to public comments expressing concern over possible effects on wildlife are not evidence that a short trail reroute would have an impact on any species. Instead, as the Service found, "wildlife can tend to habituate to predictable uses in predictable locations," such as travel on the trail. 3-ER-477; 1-FedSER-222. The Service also found that, after construction of the trails, "wildlife will return to the area used prior to construction." 3-ER-472. The Service explained that "there is not a true threshold route density at which the landscape becomes impermeable to wildlife movement." 2-FedSER-315. The EA considered identified wildlife corridors, and the challenged reroute is not in one. 3-ER-438, 447; 2-FedSER-312, 324.

38

Plaintiffs suggest (Opening Br. 54-56) that elk will be displaced by the trail, but as the Service earlier explained: "elk populations are dynamic and fluctuate based on many factors beyond management of Forest Service roads and trails." 1-FedSER-140; 2-FedSER-336. For example, the effects of nutritional resources "dramatically overshadow" the effects of motorized travel, much less nonmotorized use. 2-FedSER-337. The comments submitted on the reroute repeatedly assert that private hunting occurs on the private land neighboring this area of the Forest, which the record reveals would affect elk movement more than travel on the trail. *See, e.g.*, 4-ER-828, 809, 885, 880, 892; *see also* 1-FedSER-222. The private landowners also run cattle on the private, neighboring land. *See, e.g.*, 4-ER-770. Plaintiffs identify no evidence establishing that the trail reroute would significantly displace elk compared to those other factors. The sole scientific study cited by Plaintiffs in their Brief finds that elk react to mountain bikes. Opening Br. 55 (citing 4-ER-771 (citing Wisdom)). But the Service had already analyzed a study by the same author reaching the same conclusion, and the Service acknowledged that nonmotorized use may affect wildlife. 3-ER-580; 1-FedSER-107. Even so, the Service explained that "the vast majority of literature supports that motorized uses tend to have greater impacts to wildlife." 3-ER-580. Moreover, elk populations in this area are healthy and slightly over the desired population range. 2-FedSER-333; 1-FedSER-140.

Finally, Plaintiffs miss the mark in asserting (Opening Br. 56) that the 2009 EA's analysis is not applicable to the challenged reroute. The general wildlife section of the EA repeatedly explained that its analysis of the action alternative included construction of "proposed changes to routes" and routes in new locations—such as the reroute here. 3-ER-470, 472, 477, 464-65. The EA also analyzes biodiversity and specifically considered the construction of new trail for this specific reroute. 3-ER-442 (porcupine relocation); 3-ER-436-54; 2-FedSER-319.

### 2. The Service considered fisheries and aquatic resources.

The Service reasonably concluded that the projects authorized by the 2009 EA, including the Porcupine-Ibex reroute, would have no significant adverse impacts on fisheries, aquatic biota, or their habitat. 4-ER-664; 3-ER-460. The 2009 EA analyzed fisheries and water quality, and it incorporated the analysis of these issues from the earlier EIS. 3-ER-455-61, 540-49; 2-FedSER-326-31; 1-FedSER-181-217, 201. The EA specifically considered the potential for the Porcupine-Ibex reroute to affect fisheries, Yellowstone cutthroat trout, and the need for stream crossings. 3-ER-457 (identifying issues for porcupine project); 2-FedSER-328. The Service found this reroute would neither raise sediment concerns nor exceed the sediment standards. 3-ER-457-58. And the Service responded to the comment by MFWP about stream crossings—the sole comment

on the EA about environmental impacts specific to this reroute. *Compare* 4-ER-677, *with* 3-ER-396. The Service explained that it would mitigate impacts and that it would coordinate with MFWP's biologist on implementation and design. 4-ER-677, 622-23. Ultimately MFWP supported the reroute as long as the trail was only open to nonmotorized use. 5-ER-909; 4-ER-792.

In the Travel Plan, the Service had adopted objectives, standards, and guidelines to manage trails to protect and maintain fish habitat and water quality. 2-ER-226, 229, 271-72. The 2009 EA included these standards, standard operating procedures, and mitigation for every project, which ensured no significant adverse impacts to fisheries or aquatic resources. 3-ER-426-27, 437, 456; 4-ER-660-61. These measures include designing routes to ensure sediment levels did not exceed those identified in the Travel Plan and to allow passage of aquatic organisms. 3-ER-426-27. The trail standards also provide design requirements for stream crossings. 3-ER-375, 424; 4-ER-657-58. The Service found that the aquatic standards "will effectively reduce effects" of the projects "to be minor, with no effects to overall aquatic habitat function, and thus aquatic organism population function" in most areas, including the Porcupine area. 3-ER-458-59. The Service explained that construction of trails "can result in short term sediment increases but with much narrower surface prisms and less sediment per mile of trail than for road construction." 4-ER-668. "Trails generally have reduced sediment impacts since

trail prisms are much narrower than roads and cut and fill slopes are smaller." 2-ER-299; 1-FedSER-94.

In addition, after the Service negotiated the reroute with the landowners and the agency was evaluating whether a supplemental NEPA analysis was required, a Service biologist walked the proposed reroute and concluded that the EA adequately analyzed any potential impacts to aquatic habitats or organisms. 2-FedSER-429-30; *see also* 2-FedSER-421-28. The biologist subsequently prepared a memorandum documenting the results of his review and concluded that "effects to aquatic biota from the proposed action are fully disclosed and sufficiently mitigated such that there will be no population level effects to sensitive aquatic species including … the Yellowstone cutthroat trout." 2-FedSER-430. When a NEPA analysis, such as the EA here, "assume[s] that [certain] measures would be taken," "it is appropriate for the court to examine the details of the mitigation and construction plans in considering whether the consequences" of the project are consistent with the impacts disclosed. *Provo River Coal. v. Pena*, 925 F. Supp. 1518, 1526 (D. Utah 1996); *cf. Te-Moak Tribe*, 608 F.3d at 601 (upholding NEPA analysis when agency required post-NEPA surveys and potential changes as part of implementation). Here, the specialist report confirms that the consequences would be as predicted in the 2009 EA and that the reroute would have no significant adverse impacts on fisheries, aquatic biota, or their habitat.

### 3. NEPA does not require consideration of all impacts to recreation, and in any event, the Service adequately considered them.

"NEPA does not require the agency to assess *every* impact or effect of its proposed action, but only the impact or effect on the environment," and specifically "the physical environment—the world around us." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983). As relevant to this appeal, NEPA generally does not require that an agency assess all impacts to recreational opportunities, and it never requires that an agency analyze "impacts on citizens' subjective experiences." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1466 (9th Cir. 1996), *as amended* (June 17, 1996). In *Bicycle Trails*, this Court found that the issue of "bicyclists being crowded onto fewer trails" was not itself "an environmental impact" that had to be analyzed under NEPA. *Id.* The Court concluded that the challenged trail plan, which closed certain trails to bicyclists, did not require an EIS because the plaintiffs could not make a threshold showing that the plan "had any significant impact *on the physical environment*." *Id.* at 1467 (emphasis added). NEPA only requires analysis of impacts with a "sufficiently close connection to the physical environment." *Metro. Edison*, 460 U.S. at 778. So, although this Court has found a NEPA analysis inadequate for failing to analyze "recreational use and visual quality" together, *LaFlamme v. FERC*, 852 F.2d 389, 401 (9th Cir. 1988), the recreational impacts in that case

43

were closely connected to impacts to the physical environment, *see id*. Thus, Plaintiffs' arguments about alleged impacts to their enjoyment of recreational opportunities that are not closely linked to an impact on the natural environment are not cognizable NEPA claims.

Regardless, the Service extensively analyzed impacts to recreation in the Travel Plan and relied on that analysis here. 3-ER-393 (citing 1-FedSER-247 through 2-FedSER-311). When the Service scoped the Porcupine-Ibex reroute for a second time, the Service found that the project "will provide for permanent trail access and enhanced recreational opportunities." 4-ER-698. The Service explained that the reroute would meet several of the Travel Plan's goals, such as "[p]roviding for a broad spectrum of recreation opportunities in a variety of Forest settings" and "opportunities for summer recreation use that include hiking, mountain biking …" 4-ER-698. The public land specialist for the State of Montana supported the reroute, in part, because it "connect[ed] potential users to public lands in a shorter distance across private property than the previous trail and preserves the trail user experience with the ability to combine multiple existing trails for a loop experience." 4-ER-879.

As part of announcing the reroute, the Service presented many photos showing that the rerouted trail would provide beautiful views of mountains to the

west and the valley below, something the prior trail did not offer.  5-ER-937-40;

*see also* 2-FedSER-366-67, 368-404 (photos).  We provide one example below:



2-FedSER-374.  The Service also noted that the reroute would "resolve a

longstanding public private land conflict on the Porcupine Lowline trail."  4-ER-

698.  That conflict and the landowners' gates blocking the old trail had impaired or

foreclosed many people's ability to enjoy recreational opportunities on the trail.

*See, e.g.*, 4-ER-836 ("It has been a contentious issue for years and I finally quit

attempting to use it.…  I would like to see the trail usable in my lifetime."); 4-ER-

837 ("We were harassed aggressively" and "told we couldn't be there."); 4-ER-809

("[N]umerous complaints, by the public, of landowner's obstruction and harassment …. the landowners and their agents have been vigorously obstructing public access….  we did encounter the locked gate as well cutting our hike short."); 4-ER-853.  And some commenters expressed concerns that trying to resolve the conflict through "litigation would result in no trail at all."  4-ER-806; *see also* 4-ER-846.

Plaintiffs contend (Opening Br. 36) that the reroute reduces hunting opportunities, but the Montana chapter of the Backcountry Hunters & Anglers— one of the Plaintiffs here—asserted the opposite in comments on the 2018 scoping notice:  "We like many things about the current proposal, most notably that the proposed Porcupine-Ibex trail would be built primarily on [Forest] land with a few incursions into private land.  … *giving the public land hunter greater options*."  4-ER-867 (emphasis added).  Several hunters and hunting organizations supported the reroute for similar reasons.  4-ER-774, 796, 814, 857, 864, 870.  People could not hunt on the parts of the old trail crossing private lands, whereas the reroute presents more opportunities for hunting.  4-ER-864, 862.

While a handful of commenters expressed concerns that the trail might cause elk to move off the Forest, as explained above, the record does not support the assertions that the trail would likely displace elk to a significant degree.  As noted above, the Service's earlier analyses had found that "established travel routes can

46

have much less effect on big game animals because there is a higher degree of predictability" and "animals tend to habituate to human travel on these routes." 2-ER-267; 3-ER-477; 1-FedSER-108, 231. And because the trail will no longer have motorized activities, it will have less effect on elk than before. *See, e.g.*, 3-ER-578-80. While increased access from hunters could affect elk in the area, the Service has found that "elk showed little response to increases in hunter effort far from motorized routes." 2-FedSER-340.

Plaintiffs suggest (Opening Br. 37) that the trail was "one of a kind" based on a single comment making that assertion, but the 2009 decision and FONSI expressly found that the projects—including relocation of this trail—would have "no significant effects on unique characteristics of the area" and "there would be no one-of-a-kind (unique) characteristics affected." 4-ER-672. The NEPA regulations clarify what makes an area "unique" enough to potentially make impacts significant under NEPA, and the trail did not have any of the environmental or ecological features listed in that regulation. 40 C.F.R. § 1508.27(b)(3). Plaintiffs present no argument that the trail was "unique" as that term has been defined under NEPA.

Based on a few comments (and on the inadmissible extra-record declarations discussed above), Plaintiffs assert (Opening Br. 37-38, 40) that the relocated trail is too steep for hiking or skiing, but the Service reasonably considered this issue.

The maps depict the topography and different elevations of the two routes. *See, e.g.*, 5-ER-936. The decisionmaker acknowledged that "the old trail is open and flat in comparison" to the rerouted trail, but she explained that the "grades of the [rerouted] trail are not that extreme or out of the ordinary." 1-FedSER-408. The EA and FONSI adopted grade standards for trails consistent with "nationally accepted standards," identifying requirements for trails for mountain bikes, skiing, and snowshoeing. *See, e.g.*, 4-ER-657-58; 2-FedSER-367. While Plaintiffs point to a few comments worrying about access for the elderly and young, one of the cited comments (Opening Br. 38) asserts that this area is already accessible to the elderly and young via another route. *See* 4-ER-755 ("My family and I have accessed this area through trespass creek for years…. My 73 year old father and 15 year old son are both able to access this area."). And while flatter, the old trail involved some elevation changes as well. 5-ER-936. Plaintiffs point to no authority that NEPA requires a more granular analysis.

Based on a handful of comments, Plaintiffs argue that a different, existing trail to the east (Trespass Trail) already provides public access to the same area as the reroute, allegedly making the reroute "redundant and unnecessary." Opening Br. 39. But the maps show that Trespass Trail (#268) provides a longer, circuitous route between the trailheads and is separated from the reroute by a ridge and creek. *See, e.g.*, 5-ER-936. As revealed by one of the clearer comments on this point,

these commenters were asserting that they could "leave both Porcupine Trail head and the Ibex Trail head *on foot* and access the area of the proposed trail using existing trails … *or staying on public lands*." *See, e.g.*, 4-ER-828 (emphases added). Indeed, several commenters arguing that Trespass Trail provided sufficient access explained that they opposed the reroute because the reroute would *increase* access to the area. *See, e.g.*, 4-ER-757-58, 803. The Service could reasonably conclude that the reroute had recreational benefits for those who rely on trails, even if some people may not need trails to access these areas on foot. As to environmental impact, one supporter of the reroute explained that the "more trails, the less bushwhacking and unofficial navigation of the mountains." 4-ER-849. Moreover, Plaintiffs' contention that public access to the area already exists via other routes undermines their argument that access via the old route was critical. To the limited extent Plaintiffs contend (Opening Br. 39-40) that access already existed through the old trail, the record thoroughly establishes that conflicts with the landowners had substantially reduced access through that trail, as discussed above.

Plaintiffs develop no clear argument about motorcycles or snowmobiling aside from mentioning both cursorily in the Opening Brief. The Service decided to eliminate motorized use in response to concerns raised by MFWP and the need to negotiate with the landowners. 5-ER-909-10. But this change only increases the

environmental benefits of the reroute.  *See, e.g.*, 3-ER-453, 580; 1-FedSER-159, 227.  And the Service foreclosed snowmobiling in this area and on this trail with the Travel Plan in 2006, so the reroute had no effect on snowmobiling.  2-ER-250.

### 4.    The railroad deeds are irrelevant.

Plaintiffs argue that the Service erred by not analyzing certain railroad deeds that people submitted with comments and their potential relevance to the old trails. Opening Br. 43-54.  But the railroad deeds are irrelevant to the NEPA analysis for several reasons.  As the district court found, Plaintiffs have "fail[ed] to … explain how the deeds would be relevant to the agency's analysis of the environmental impacts."  1-ER-19, 43.  "The theme of" NEPA "is sounded by the adjective 'environmental,' which means that NEPA does not require an agency to assess all impacts of a project, only those that have a reasonably close causal relationship with a change in the physical environment."  *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 943 (9th Cir. 2005) (cleaned up); *Metro. Edison*, 460 U.S. at 772, 774; *N. Idaho Cmty.*, 545 F.3d at 1156 (explaining that "NEPA requires federal agencies to consider the *environmental* impact of major federal action" and thus did not necessarily require analysis of impacts "on historic properties").

Whether the Service could have attempted to assert an easement under the railroad deeds does not change the environmental impacts of the reroute on the physical world, and thus NEPA did not require an analysis of that issue.  *See, e.g.*,

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1248 (9th Cir. 2005) (finding argument persuasive that regardless of "whether or not the preferred alternative involved a commercial sale component, the environmental impacts of the project are the same"); *City of Mukilteo v. U.S. Dep't of Transp.*, 815 F.3d 632, 638 (9th Cir. 2016) (finding changes to project "are not enough to warrant a supplemental EA, as neither of these changes, in themselves, will necessarily alter the environmental impact"). Moreover, the Service analyzed a "no action" alternative in the EA which included keeping the trail in its old location—which Plaintiffs appear to assume would be allowed by the deeds—so the Service's disagreement with Plaintiffs about the relevance of the deeds did not produce a more truncated environmental analysis. 3-ER-430, 413. Plaintiffs still have not explained how the railroad deeds would change the environmental analysis, despite both the district court judge and magistrate judge rejecting their argument on this basis. *See* 1-ER-19, 43.

The district court also correctly found that Plaintiffs' arguments about the railway deeds were insufficient to show an error by either the magistrate judge or the agency. 1-ER-19-20. The district court found that "stating that *whole sections are covered by railway easement is insufficient.*" 1-ER-20 (emphasis added). On appeal, Plaintiffs again assert that section 15 is covered by a railway deed (4-ER-789), without pointing to any other evidence establishing where the supposed

51

easement exists on that section or the scope of the easement. Opening Br. 43-54. Furthermore, the Porcupine Lowline Trail crossed private land in sections 15, 22, 27, 34, and 35, 4-ER-702, so even *if* an easement existed in section 15, the Service could not have established that it owned that trail based on the cited deed.

Even with respect to section 15, the deed reserves "an easement in the public for any public roads heretofore laid out or established, and now existing." 4-ER-789. The deed does not identify the location of any public roads, much less the trail at issue. Plaintiffs rely (Opening Br. 46-47) heavily on Black's Law Dictionary and develop little argument that an easement existed under Montana law on the facts presented here. *See Reid v. Park Cty.*, 192 Mont. 231, 234 (1981). Montana generally relies on "historical use to determine the location of an express easement when the grant fails to adequately define the location and scope" and that "fixes that right and limits it to that particular course." *Ganoung v. Stiles*, 388 Mont. 152, 158 (2017). Here, the Service found that "[t]he location of the trail alignment itself has varied up to a mile over the decades." 5-ER-911-12, 914-23, 927; 1-FedSER-22-41. Indeed, a comparison of the 1976 map of the "historic" trail to "the present alignment" revealed "there to be only two segments totaling less than ½ mile dating to this time period." 1-FedSER-20. Given these major changes in the decades since the deeds, Plaintiffs needed to provide *some* analysis or explanation for why the deeds provided an easement for the trail that existed

when the Service made its decision. *See, e.g.*, *Leisz v. Avista Corp.*, 340 Mont. 294, 301 (2007) (finding major relocation affected ability to establish easement and interpreting deed with identical language); *Laden v. Atkeson*, 112 Mont. 302, 308 (1941) ("Dominant owners cannot legally … select a new route of travel, without the consent of the servient owner.").

Both Plaintiffs' briefing and comments fail to provide adequate analysis of these issues. For example, Plaintiffs' objections to the magistrate's findings and recommendations listed sections allegedly "covered by railway easements." 2-FedSER-451. The district court reasonably found that "stating that whole sections are covered by railway easement is insufficient to form a proper objection." 1-ER-20. The comments were similarly insufficient. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978) ("Comments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern.").

This case bears no similarity to those cited by Plaintiffs for the proposition that the Service had to respond to comments and analyze the deeds. As discussed, Plaintiffs have not established that these deeds have any relevance to the *environmental* analysis the agency is required to consider. Moreover, several of the cases cited by Plaintiffs involve EISs or other agency proceedings when the burden of responding to comments is higher than with an EA. *See, e.g.*, *Dubois v.*

53

*U.S. Dep't of Agric.*, 102 F.3d 1273, 1291 (1st Cir. 1996). "NEPA does not require federal agencies to 'assess ... consider ... [and] respond' to public comments on an EA to the same degree as it does for an EIS," though "an agency must permit some public participation when it issues an EA." *California Trout v. FERC*, 572 F.3d 1003, 1016 (9th Cir. 2009) (quoting see 40 C.F.R. § 1503.4); *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012) (concluding that regulations do not require a response to comments in context of an EA); *see also Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Engineers*, 524 F.3d 938, 952 (9th Cir. 2008) ("[C]irculation of a draft EA [for comment] is not required in every case."). The Service provided adequate opportunity for public participation with three comment periods. And even with an EIS, "an agency need not respond to every single scientific study or comment." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 668 (9th Cir. 2009). For those cases involving an EA, this Court has reasoned that an agency sometimes must respond to comments that "cast[] serious doubt upon the reasonableness" of the agency's conclusions related to the "*potential environmental consequences*" of the action. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001) (emphasis added), *abrogated in part by Winter v. NRDC*, 555 U.S. 7 (2008). For the reasons stated, Plaintiffs' arguments about the deeds do not meet that threshold.

**C.    The Service analyzed a reasonable range of alternatives.**

The Service properly considered two alternatives in the EA, the proposed

action and the no-action alternative.  The Service concluded two alternatives were

adequate because "the significance of environmental issues could be minimized

through application of mitigation and design features to the Proposed Action," and

"the effects of other alternatives … can be adequately understood through

comparison of the Proposed Action and No Action Alternatives."  3-ER-407-08.

Plaintiffs ignore that reasoning and do not even try to rebut it.

"[A]n agency's obligation to consider alternatives under an EA is a lesser

one than under an EIS." *Native Ecosystems*, 428 F.3d at 1246.  "[W]hereas with an

EIS, an agency is required to '[r]igorously explore and objectively evaluate all

reasonable alternatives,' *see* 40 C.F.R. § 1502.14(a), with an EA, an agency only is

required to include a brief discussion of reasonable alternatives." *N. Idaho Cmty.*,

545 F.3d at 1153.  NEPA "does not impose a numerical floor on alternatives to be

considered." *Native Ecosystems*, 428 F.3d at 1246; 36 C.F.R. § 220.7(b)(2).  This

Court should uphold the Service's EA examining two alternatives, as it has done

with many similar EAs.  *See, e.g.*, *Native Ecosystems*, 428 F.3d at 1246-49; *N.*

*Idaho Cmty.*, 545 F.3d at 1153-54; *Earth Island*, 697 F.3d at 1021-22.  "[B]ecause

the [agency] 'briefly discussed two alternatives,' and because 'the Project proposed

in the … EA will not result in significant environmental effects,' the analysis was

sufficient." *Earth Island*, 697 F.3d at 1022 (quoting *N. Idaho Cmty.*, 545 F.3d at 1153-54). "[I]t makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined … will have no significant environmental effects anyway." *Id.* at 1023 (quoting *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994)).

Moreover, even in the context of an EIS, "a party challenging an agency's failure to consider an alternative" must "'show that the alternative is viable.'" *City of Los Angeles, California v. FAA*, 63 F.4th 835, 846-48 (9th Cir. 2023) (quoting *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013)). Plaintiffs do not describe with specificity what alternatives they wished the Service had analyzed, much less establish that they are viable.

Here, the action alternative resulted from nearly two decades of negotiation. This Court has upheld an analysis limited to action and no-action alternatives when the agency action "is a negotiated agreement." *California ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 797 (9th Cir. 2014). "Discussing a hypothetical alternative that no one had agreed to (or would likely agree to) would have been unhelpful, and as a result, the … EIS reasonably compared a hard-fought negotiated agreement to no agreement at all." *Id.* Plaintiffs point to no evidence showing a different location, uses, or resolution to the dispute would have been viable. "[A]n agency is not required to consider

56

'remote and speculative' alternatives." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *Vermont Yankee*, 435 U.S. at 551).

Plaintiffs also have not established that their vague alternatives differ in a significant way from either the reroute or the no action. An agency need not "undertake a 'separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.'" *Id.* (quoting *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir. 1990)). "NEPA does not require the EIS to have considered every conceivable permutation." *Id.* at 871-72. Along with a lack of specificity, Plaintiffs have not explained how variations on the precise location of the trail or in design features would have significantly different environmental consequences. *Paradise Ridge Def. Coal. v. Hartman*, 757 F. App'x 536, 538 (9th Cir. 2018) (holding agency reasonably "consider[ed] one route from each geographic corridor, because the routes within each geographic corridor had substantially similar consequences"). Plaintiffs also contend (Opening Br. 63) that the Service failed to consider an alternative that did not remove the trail or that preserved historic access, but the no action alternative considered maintaining the trail in the same location and thus continuing to assert a right to access. 3-ER-430, 413, 582. That Plaintiffs speculate that the Service could have taken different legal

steps to preserve that historic access does not affect the environmental impacts of maintaining the trail, which the Service considered. *Cf. N. Plains Res. Council v. Lujan*, 874 F.2d 661, 666 (9th Cir. 1989) (explaining that "discussion of coal development by leasing also covers coal development by exchange").

Plaintiffs also fault (Opening Br. 62-63) the Service for refining the route in the process of implementation but not including these slight changes as alternatives in the EA. But agencies often make minor changes while implementing a project, and Plaintiffs point to no precedent suggesting the agencies should have analyzed them all in the original NEPA document. Such minor changes to the route "are not significantly distinguishable from alternatives actually considered" and they have "substantially similar consequences.'" *Westlands Water*, 376 F.3d at 868 (quoting *Headwaters*, 914 F.2d at 1181). Plaintiffs have forfeited any argument that these minor changes required a supplemental NEPA analysis, and they do not under this Court's precedent. *See, e.g.*, *N. Idaho Cmty.*, 545 F.3d at 1155.

Plaintiffs rely on cases that bear no similarity to this one. In several, this Court found that the agency had erred by assessing alternatives that were so similar the agency could not meaningfully analyze environmental impacts. *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1051 (9th Cir. 2013) (finding "no meaningful difference between the four alternatives" including no action); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1218 (9th Cir.

2008) (finding NEPA violations when "alternatives are hardly different"). In contrast, here the two alternatives differed (at least to the extent any of the potential alternatives for a trail reroute could) and allowed the Service to fully analyze the environmental consequences of the reroute. And in *Southeast Alaska Conservation Council v. Federal Highway Administration*, the agency prepared an EIS—which requires a more rigorous alternatives analysis than an EA—and the agency rejected an alternative for a reason that applied equally to the alternative that it chose. 649 F.3d 1050, 1059 (9th Cir. 2011). Here, the agency had good reason for not analyzing additional, vaguely defined alternatives.

*　　*　　*　　*　　*

In sum, the Service reasonably analyzed the environmental consequences and found that this trail reroute would not have a significant impact on the environment under NEPA. Plaintiffs have not established that the Service's conclusions were arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment.[7]

---

[7] If this Court concludes that the Service erred and that any error was not harmless, 5 U.S.C. § 706, this Court should remand to the district court to consider remedy. *See, e.g.*, *350 Montana v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022). Plaintiffs have not developed any argument for vacatur, and "there is a dearth of evidence concerning the impact of vacatur." *Id.* The landowners donated

Respectfully submitted,

/s/ *Robert P. Stockman*
TODD KIM
*Assistant Attorney General*

Of Counsel:

RACHEL HERON
ROBERT P. STOCKMAN
*Attorneys*
BABAK RASTGOUFARD
*Attorney*
Office of the General Counsel
U.S. Department of Agriculture
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 353-3527
Robert.Stockman@usdoj.gov

June 2, 2023
90-1-4-15792

---

easements, the Service has released easements, and the Service has completed the reroute in the new location. Thus, any remedy would merit separate briefing. *Cf. Kettle Range Conservation Grp. v. U.S. Bureau of Land Mgmt.*, 150 F.3d 1083, 1087 (9th Cir. 1998) ("We are also concerned that at this point it might be impractical to attempt to unscramble the eggs. Any such effort might produce results that are in fact not equitable.").

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**          22-35555

I am the attorney or self-represented party.

**This brief contains 13,288 words,** excluding the items exempted by Fed. R. App. P. 32(f), and including the 19 words in the image from the record. *See* Cir. R. 31-1(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**    s/ Robert P. Stockman

**Date**         June 2, 2023

# ADDENDUM

40 C.F.R. § 1508.9 ................................................................................... 1a

36 C.F.R. § 220.7 .................................................................................... 2a

**40 C.F.R. § 1508.9 Environmental assessment.**

Environmental assessment:

(a)    Means a concise public document for which a Federal agency is responsible that serves to:

    (1)    Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

    (2)    Aid an agency's compliance with the Act when no environmental impact statement is necessary.

    (3)    Facilitate preparation of a statement when one is necessary.

(b)    Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

**36 C.F.R. § 220.7 Environmental assessment and decision notice.**

(a)     Environmental assessment. An environmental assessment (EA) shall be prepared for proposals as described in § 220.4(a) that are not categorically excluded from documentation (§ 220.6) and for which the need of an EIS has not been determined (§ 220.5). An EA may be prepared in any format useful to facilitate planning, decisionmaking, and public disclosure as long as the requirements of paragraph (b) of this section are met. The EA may incorporate by reference information that is reasonably available to the public.

(b)     An EA must include the following:

　(1)     Need for the proposal. The EA must briefly describe the need for the project.

　(2)     Proposed action and alternative(s). The EA shall briefly describe the proposed action and alternative(s) that meet the need for action. No specific number of alternatives is required or prescribed.

　　(i)     When there are no unresolved conflicts concerning alternative uses of available resources (NEPA, section 102(2)(E)), the EA need only analyze the proposed action and proceed without consideration of additional alternatives.

　　(ii)     The EA may document consideration of a no-action alternative through the effects analysis by contrasting the impacts of the proposed action and any alternative(s) with the current condition and expected future condition if the proposed action were not implemented.

(iii) The description of the proposal and alternative(s) may include a brief description of modifications and incremental design features developed through the analysis process to develop the alternatives considered. The documentation of these incremental changes to a proposed action or alternatives may be incorporated by reference in accord with 40 CFR 1502.21.

(iv) The proposed action and one or more alternatives to the proposed action may include adaptive management. An adaptive management proposal or alternative must clearly identify the adjustment(s) that may be made when monitoring during project implementation indicates that the action is not having its intended effect, or is causing unintended and undesirable effects. The EA must disclose not only the effect of the proposed action or alternative but also the effect of the adjustment. Such proposal or alternative must also describe the monitoring that would take place to inform the responsible official whether the action is having its intended effect.

(3) Environmental Impacts of the Proposed Action and Alternative(s). The EA:

(i) Shall briefly provide sufficient evidence and analysis, including the environmental impacts of the proposed action and alternative(s), to determine whether to prepare either an EIS or a FONSI (40 CFR 1508.9);

(ii) Shall disclose the environmental effects of any adaptive management adjustments;

(iii) Shall describe the impacts of the proposed action and any alternatives in terms of context and intensity as described in the definition of "significantly" at 40 CFR 1508.27;

     (iv)    May discuss the direct, indirect, and cumulative impact(s) of the proposed action and any alternatives together in a comparative description or describe the impacts of each alternative separately; and

     (v)    May incorporate by reference data, inventories, other information and analyses.

(4) Agencies and Persons Consulted.

(c)    Decision notice. If an EA and FONSI have been prepared, the responsible official must document a decision to proceed with an action in a decision notice unless law or regulation requires another form of decision documentation (40 CFR 1508.13). A decision notice must document the conclusions drawn and the decision(s) made based on the supporting record, including the EA and FONSI. A decision notice must include:

(1) A heading, which identifies the:

….

(2)    Decision and rationale;

(3)    Brief summary of public involvement;

(4)    A statement incorporating by reference the EA and FONSI if not combined with the decision notice;

(5)    Findings required by other laws and regulations applicable to the decision at the time of decision;

(6)    Expected implementation date;

(7)    Administrative review or appeal opportunities and, when such opportunities exist, a citation to the applicable regulations and directions on when and where to file a request for review or an appeal;

(8)    Contact information, including the name, address, and phone number of a contact person who can supply additional information; and

(9)    Responsible Official's signature, and the date the notice is signed.

(d)    Notification. The responsible official shall notify interested and affected parties of the availability of the EA, FONSI and decision notice, as soon as practicable after the decision notice is signed.